## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:23-cr-49 (JAM) |
| JERRARD SANTIAGO, <br> *Defendant*. | |

## MEMORANDUM AND ORDER ON *FATICO* HEARING

Defendant Jerrard Santiago has pleaded guilty to two counts of distributing controlled substances in violation of federal law. As part of Santiago's plea agreement, the parties asked the Court to hold a *Fatico* hearing to determine for sentencing purposes whether Santiago should be additionally responsible for a third illegal drug transaction—the distribution of fentanyl to a victim ("E.B.") who overdosed and died.[1]

For the reasons discussed below, I conclude by a preponderance of the evidence that on May 18, 2021, Santiago knowingly distributed cocaine to E.B. that was laced with fentanyl. I further conclude that the fentanyl in this substance proximately caused E.B.'s overdose and death.

### FINDINGS OF FACT

In the early morning hours of May 18, 2021, E.B. was sitting at a gaming table at the Mohegan Sun casino when he collapsed unconscious from his chair and fell to the floor. Emergency medics were not able to revive him, and E.B. later died at a hospital. The parties dispute whether Santiago distributed a controlled substance to E.B. that killed him.

---

[1] *See United States v. Fatico*, 603 F.2d 1053, 1057 & n.9 (2d Cir. 1979); Doc. #55 at 4 (plea agreement) ("The parties agree that the alleged conduct at issue in Count I of the Indictment will be addressed in a *Fatico* hearing after the change of plea and prior to sentencing in this case. The Government reserves its right to argue and prove that the defendant sold a mixture and substance containing a detectable amount of Fentanyl to an individual E.B. on or about May 18, 2021, and to argue for an upward departure or variance for any consequences of that sale. The defense reserves the right to contest whether the sale took place or that any consequences that flowed from that alleged sale and to object to any departure or variance sought by the Government as a result.").

The following recitation of facts is based on evidence presented over the course of three days of hearings. The evidence included testimony from two of E.B.'s friends who were with him at the casino (Jacob Kinnaman and Kyle Mitidieri), a Yale School of Medicine addiction expert (Dr. Stephen Holt), a stranger whom E.B. met at the casino (Anthony Bardliving), and two law enforcement agents (Special Agent Keith Warzecha of the DEA and Detective Cody Floyd of the Mohegan Tribal Police Department). Much of the testimony concerned the casino's video footage of E.B. in the hours leading up to and including his collapse.

I make the following findings of fact on the basis of the evidence presented before me. On the afternoon of May 17, 2021, E.B and his two friends—Jacob Kinnaman and Kyle Mitidieri—drove from New York City to the Mohegan Sun casino where they had reserved a room and planned to stay the night.[2] They arrived at the casino around 4:00pm that day.[3]

The trio brought about half a gram of cocaine worth about $50 with them, as well as marijuana and beer.[4] E.B. smoked marijuana regularly (including in the car on the way to the casino) and occasionally used cocaine.[5] E.B. was not known to have previously used any heroin or fentanyl.[6]

Upon arrival, the three friends took their bags to their hotel room, then brought food from Chick-fil-A back to the room for dinner and drank some beer.[7] Then E.B. went to the casino to play poker, while his two friends stayed in the room.[8]

At around 9:00pm, E.B. returned to the room, and the trio drank more beers and used

---

[2] Doc. #63 at 22, 26-27.
[3] *Id.* at 27; Govt. Ex. #3A.
[4] *See* Doc. #63 at 27, 29-30, 51; Doc. #71 at 9-13.
[5] *See* Doc. #63 at 24-25, 27; Doc. #71 at 15.
[6] *See* Doc. #63 at 25-26.
[7] *Id.* at 27, 30. Kinnaman also testified that E.B. also brought some vodka and took some shots of vodka at some point that evening. *Id.* at 51, 56.
[8] *See id.* at 30-31.

2

some of their cocaine.[9] The cocaine remained in the room.[10]

Kinnaman and Mitidieri each testified that this cocaine produced the feelings they ordinarily associate with cocaine: they felt energized, awake, and happy.[11] E.B. did not suggest that he felt unwell after consuming the cocaine; nor did he appear to be unwell to either Kinnaman or Mitidieri.[12]

Around 10:00pm, the trio headed down to the casino.[13] They visited a bar where they each took a shot.[14] They then split up—E.B. went to play poker, while Mitidieri and Kinnaman went to play blackjack and roulette.[15]

At around midnight, the three friends met up again at the poker room.[16] E.B. looked well and normal at that time.[17] E.B. stayed in the poker room, while Kinnaman and Mitidieri went to play blackjack.[18]

From 12:35am to 1:48am (now May 18, 2021), E.B. and Kinnaman exchanged a series of text messages.[19] Kinnaman inquired about E.B.'s status, and E.B. replied that he was about "even" playing poker—that is, he had neither won nor lost money.[20] Kinnaman texted that he had finished gambling at 1:05am, and at 1:11am, E.B. replied "Room and coke" and "1:45."[21] At

---

[9] *Id*. at 31, 60. According to Kinnaman, he and Mitidieri used more of the cocaine than E.B. *Id.* at 65.
[10] Doc. #71 at 17.
[11] *See* Doc. #63 at 31-32; Doc #71 at 28-29.
[12] Doc. #63 at 32. It is not clear if the trio ultimately used all of the cocaine or if any remained at the end of the trip. *See, e.g.*, Doc. #71 at 20-21. Regardless, law enforcement never recovered any of this cocaine for testing. *See* Doc. #63 at 46-47, 183. Santiago argues the unavailability of this cocaine suggests some nefarious intent on the part of Kinnaman and Mitidieri. Doc. #75 at 6-8. I do not agree. The three friends brought a relatively small amount of cocaine with them, which they used throughout the night—it is likely that either no cocaine or that only a tiny amount remained.
[13] Doc. #63 at 33.
[14] *Ibid*.
[15] *Ibid*.
[16] *Id.* at 33-35.
[17] *Id.* at 34; Doc. #71 at 30-31.
[18] Doc. #63 at 35.
[19] *Id.* at 36-43; Govt. Ex. #4.
[20] Doc. #63 at 37; Govt. Ex. #4 at 1.
[21] Doc. #63 at 37-39; Govt. Ex. #4 at 3-4.

1:14am, Kinnaman texted "Walk back I'll see u on the way."[22] Thirteen minutes later, E.B. texted "pls don't do all" and "I'm on the come up," which Kinnaman interpreted as a request not to use all the remaining cocaine before E.B. got to the room.[23] The two exchanged several more texts coordinating their return to the hotel room. At 1:48am, E.B. texted "Save some for a real one."[24] This was the last text message that E.B. sent to Kinnaman.[25]

Casino video footage shows that E.B. left the casino poker room at around 1:35am, approximately the same time that he was communicating by text with Kinnaman.[26] After he walked out, he ran into a man identified as Anthony Bardliving.[27] Bardliving and E.B. had met earlier in the evening and had become friendly.[28]

The casino video footage shows E.B. and Bardliving walking away from the poker room and towards the blackjack room.[29] But as E.B. left the poker room with Bardliving, the video footage shows that the defendant Jerrard Santiago was walking slightly behind them.[30] E.B. and Bardliving conversed for several minutes while walking. The footage shows that Santiago broke into their conversation and began talking to E.B. and Bardliving—eventually, Bardliving walked off at 1:38am, leaving E.B. and Santiago alone.[31]

At 1:39am, E.B. and Santiago walked into a men's room together.[32] There they remained until they left the bathroom together nearly seven minutes later at approximately 1:46am.[33] The

---

[22] Doc. #63 at 40; Govt. Ex. #4 at 6.
[23] Doc. #63 at 41; Govt. Ex. #4 at 7.
[24] Doc. #63 at 42-43; Govt. Ex. #4 at 10.
[25] Doc. #63 at 43.
[26] *Id.* at 102; Govt. Ex. #3F.
[27] Doc. #63 at 106-07.
[28] Doc. #71 at 44-46; *see also* Doc. #63 at 178-80 (testimony about E.B. and Bardliving getting a drink together at the Bow and Arrow bar at approximately 11:00pm).
[29] *Id.* at 106-16; *see also* Govt. Ex. #3H-#3O.
[30] Doc. #63 at 107-09, 128; *see also* Govt. Ex. #3H.
[31] Doc. #63 at 112-13; Govt. Ex. #3L.
[32] Doc. #63 at 116-17; Govt. Ex. #3O.
[33] Doc. #63 at 117.

casino does not have video cameras in the men's room that could disclose what E.B. and Santiago did inside.[34]

 After they left the bathroom together, the casino's video footage shows E.B. and Santiago circling the concourse for about five minutes before E.B. settled at a gaming table.[35] E.B. sat down to play at approximately 1:51am, while Santiago stood nearby and behind him.[36]

E.B. continued to play for about ten minutes, frequently adjusting the mask over his nose.[37] This repeated manipulation of the mask was consistent with E.B.'s first feeling signs of respiratory distress and his impending collapse.[38]

At some point during that interval, Santiago walked away from the table to talk on his phone, and then to speak with a man later identified as Robert Boria (Santiago's brother).[39] Santiago appeared to show Boria an object from his pocket, but it is not clear what it was.[40] Santiago then walked back over to E.B.'s table shortly afterward.[41]

At that point, E.B. appeared to be unfocused.[42] A few seconds later, he put his head in his arms.[43] Then within seconds he collapsed out of his chair and fell unconscious to the floor.[44] He collapsed at 2:01am—approximately 15 minutes after he left the bathroom with Santiago.[45]

---

[34] The video footage shows that a casino maintenance staff member named Candace Girard walked into the bathroom at around 1:45am. *Id.* at 118. Detective Floyd subsequently interviewed Girard two months later, and she signed a statement saying that she remembered Santiago and E.B. arguing about money. *Id.* at 118-23. Because the government did not call Girard as a witness and because of my concern about Girard's ability to remember the particulars of what she heard in the bathroom when she was not interviewed until two months later, I decline to rely on Girard's statement as grounds for my decision in this case.

[35] *Id.* at 126-28.

[36] *Id.* at 128.

[37] *Id.* at 129-30.

[38] Doc. #64 at 22-23.

[39] Doc. #63 at 130-31; Doc. #64 at 131.

[40] Doc. #63 at 131-32; Doc. #64 at 131-32.

[41] Doc. #63 at 132-33.

[42] Doc. #64 at 23-34.

[43] *Id.* at 24.

[44] Doc. #63 at 133.

[45] *Id.* at 117, 133.

The video footage shows that as E.B.'s head slumped just before his collapse, Santiago reached out to tap him as if to rouse him.[46] Then, as E.B. fell from his chair, Santiago grabbed at him but then withdrew his hand and stood above him for approximately twenty seconds while looking at E.B. on the floor before turning his head to look around and then wandering away behind a bank of slot machines.[47] Over the next several minutes multiple people gathered around E.B.'s body on the floor in apparent concern.[48] The video shows that Santiago re-appeared several minutes later while E.B. was still lying on the floor and briefly spoke to a casino employee before again walking away.[49]

Casino security personnel evidently conducted a review of video footage soon after E.B.'s collapse, and an officer found Santiago in a different part of the casino at around 2:39am.[50] Santiago told the officer he had met E.B. playing poker and that he did not know E.B.'s name or anything else about him or his activities.[51]

E.B. was taken to the hospital unconscious, and he would not wake again.[52] He passed away in a hospital about ten days later.[53]

To help explain the cause of E.B.'s death, the government called as a witness Dr. Stephen Holt, an addiction medicine specialist and general internist of the Yale School of Medicine and Yale New Haven Hospital.[54] Based primarily on his review of the video footage and medical records, Dr. Holt provided highly persuasive expert testimony.

Dr. Holt testified about hospital test records reflecting several substances in E.B.'s

---

[46] Govt. Ex. #3P (2:00:54).
[47] *Ibid.* (2:01:00-2:01:51).
[48] *Ibid.* (2:02:00-2:04:58).
[49] Doc. #63 at 135-36; Govt. Ex. #3R (2:08:54-2:09:14).
[50] Doc. #63 at 139-143.
[51] *Id.* at 142-43.
[52] Doc. #64 at 29-37.
[53] *Id.* at 36.
[54] Doc. #63 at 188-89.

system—including fentanyl, cocaine, marijuana, and alcohol.[55] Dr. Holt was convinced that it was fentanyl that was the most likely cause of E.B.'s death: "In light of the potency of fentanyl relative to all other opioids, knowing that fentanyl was present in his urine and there's no other reason for it to be there, fentanyl is the most likely explanation for his overdose."[56]

According to Dr. Holt, a fentanyl overdose would typically produce the type of response that E.B. appears from the video footage to have experienced.[57] Fentanyl is a type of synthetic opioid that reduces the body's drive to breathe, decreasing the flow of oxygen and leading to the buildup of $CO_2$.[58] Eventually, it leads to collapse and brain damage.[59] Persons like E.B. who do not regularly use fentanyl or other opioids are especially susceptible to an overdose.[60]

Dr. Holt explained that a person suffering from a fentanyl overdose would be very likely to become lethargic before lapsing into unconsciousness—which is clearly what happened to E.B. as shown on the video footage.[61] Moreover, E.B.'s body released a large quantity of $CO_2$ when emergency responders placed a breathing mask on him, suggesting that toxic levels of $CO_2$ had accumulated in his body and brain.[62]

Dr. Holt ruled out causes other than fentanyl. He noted that E.B.'s blood alcohol content at the hospital was about 0.1.[63] While 0.1 is enough to feel a "bit buzzed," it is only slightly above the legal limit for driving a car and is well below the threshold for falling unconscious.[64]

Dr. Holt similarly noted that cocaine would be unlikely to produce the slow lapse into

---

[55] Doc. #64 at 12-16.
[56] *Id.* at 12-13.
[57] *Id.* at 25.
[58] Doc. #63 at 194-200.
[59] *Id.* at 198.
[60] *Id.* at 203, 207.
[61] *Id.* at 199; Doc. #64 at 22-25.
[62] *Id.* at 32.
[63] *Id.* at 15.
[64] *Id.* at 16.

unconsciousness that E.B suffered.[65] The typical danger from cocaine is a sudden cardiac issue, and testing revealed no sign of heart problems in E.B.[66] Nor were E.B.'s actions in the last moments before his collapse consistent with experiencing a sudden heart attack.[67]

Dr. Holt was also asked about the role of marijuana. He could not "fathom how marijuana [had] anything to do with [E.B.] losing consciousness."[68]

Dr. Holt testified not only about the substances that were present in E.B.'s body but about how the timing and sequence of events was most consistent with E.B. having snorted a substance such as cocaine that contained fentanyl only a short time before his collapse. Cocaine was commonly laced with fentanyl in May 2021.[69] According to Dr. Holt, an overdose caused by ingesting opioids through the nose would typically take about 5-15 minutes.[70] E.B. collapsed about 15 minutes after exiting the bathroom.[71] "I think [E.B.] between 1:39 and 1:46 snorted … some proportion of fentanyl … [a]nd within 10 minutes he started to get a little woozy," then "by 15 minutes, 15 to 20 minutes after using, he overdosed, lost consciousness, and tragically passed away."[72]

To be sure, there was—as noted above—significant evidence of E.B.'s prior use of marijuana, cocaine, and alcohol in the hours before his collapse.[73] But Dr. Holt convincingly explained why it was unlikely that E.B.'s earlier use of these substances was the cause of his collapse and death. None of these substances would have caused the lethargy and respiratory

---

[65] *See, e.g.*, *id.* at 24-26.

[66] *Id.* at 25, 38-39, 71.

[67] *Id.* at 24-26.

[68] *Id.* at 45.

[69] *Id.* at 14, 39.

[70] *Id.* at 21; *see also* Doc. #63 at 207 ("an opioid naïve person, 5 to 15 minutes would be when I'd expect them to start having symptoms, and then maybe 15 to 20 minutes to have pe[a]k effect").

[71] *Id.* at 117, 133.

[72] Doc. #64 at 41; *see also id.* at 62-63 (testimony that it was an opioid—most likely fentanyl—that caused the overdose).

[73] *See, e.g.*, *id.* at 12-16, 49, 60.

shutdown that caused his collapse.[74] And even if some of those substances were tainted with fentanyl, Dr. Holt explained how the fentanyl reaction would not have been delayed until 2:01am, when E.B. collapsed.[75] The video footage as well as the testimony from Kinnaman and Mitidieri suggests that E.B. was previously alert and does not suggest that E.B. became lethargic and impaired until just a few minutes before his collapse.[76]

In short, the evidence strongly shows that E.B.'s collapse was because he ingested a substance containing fentanyl approximately 15 to 20 minutes before he collapsed. The remaining question is whether the source of that fentanyl was Santiago.

I am convinced for a combination of reasons that the source was Santiago: that he gave E.B. cocaine that was laced with fentanyl and that caused E.B.'s death. Although there is no video of what transpired between E.B. and Santiago in the casino bathroom, the fact that they went together to the bathroom and then left together seven minutes later strongly suggests that they interacted with each other in the bathroom and that they chose a location they felt to be safe from video surveillance.

As the text messages between E.B. and Kinnaman reflect, E.B. was anxious to use cocaine when he interacted with Santiago. A later review of E.B.'s cellphone reflected that at 1:43am (while he was in the bathroom with Santiago) E.B. called Santiago's telephone number and saved the number as a contact in his phone under the nickname "Ice," a street term for cocaine, which is consistent with a drug-dealing relationship between them.[77] For his part, Santiago admitted that E.B. gave him poker chips in the bathroom; although he claimed that E.B. "just wanted to give it to him," the far more likely explanation is that this was an initial payment

---

[74] Doc. #64 at 16, 25, 38-39, 45, 71.
[75] *Id.* at 40.
[76] *See e.g.*, Doc. #63 at 33-34; Doc. #71 at 28-31.
[77] Doc. #64 at 117-124; Govt. Ex. #16 at 7.

by E.B. for some quantity of cocaine.[78]

Other circumstantial evidence points in the same direction. In an unrelated drug sale videotaped by law enforcement, Santiago told a confidential informant in February 2023 that he occasionally visited the Mohegan Sun casino to sell cocaine.[79] This suggests that a reason for Santiago to be at the casino on May 18, 2021, was to sell cocaine.

I also credit the government's argument about why Santiago remained in proximity to E.B. after they left the bathroom. He wanted to stay close by in order to see if E.B. would want more cocaine.

In addition, I note the callous nature of Santiago's reaction to E.B.'s collapse. The fact that Santiago was within arm's reach of E.B. and saw him suddenly collapse but then did nothing to try to help him as he lay there on the floor suggests that Santiago did not want his relationship with E.B. to come to light. There is no other likely explanation as to why Santiago would have failed to take any steps to help a stricken person whom he had just spent time with at the casino.

Santiago points the finger at Anthony Bardliving—another stranger with whom E.B. became acquainted at the casino not long before his collapse. But the video footage does not show a drug transaction between E.B. and Bardliving or—like E.B. and Santiago—that they went together for an extended period to the bathroom or another area where they could not be seen by a video camera.[80] Moreover, Santiago called Bardliving as a witness, and nothing in his testimony suggested that Bardliving gave any fentanyl or other drugs to E.B.[81]

---

[78] Doc. #64 at 130; *see also id.* at 191-92, 195.

[79] *Id.* at 143. Although Santiago has denied giving E.B. drugs that killed him, Santiago told DEA agents when later interviewed that he was a prolific crack dealer for more than twenty years until he stopped dealing crack in 2016. *Id.* at 127.

[80] *See, e.g.*, Doc. #63 at 159-63; Govt. Ex. #3H–#3J.

[81] Santiago did not ask Bardliving if he had distributed any cocaine or fentanyl to E.B. Bardliving testified that he brought marijuana with him to the casino but denied offering to share any with E.B. or Santiago. Doc. #71 at 49. He testified that E.B. offered him some marijuana but that he declined because he had his own. *Id.* at 50.

I have considered Santiago's additional arguments about conflicts in the testimony and am not convinced that any such conflicts or inconsistencies are material or that they create doubt about Santiago's culpability. Nor am I persuaded by Santiago's attack on the credibility of Special Agent Keith Warzecha. The vast majority of evidence offered by Agent Warzecha was independently corroborated, such as by means of video footage or electronic recordings, and any doubts about Agent Warzecha's credibility would not affect my ruling in this case.

Although I conclude that Santiago knowingly distributed cocaine that was laced with fentanyl to E.B., there has been no argument or evidence that Santiago specifically knew that the cocaine he gave to E.B. was laced with fentanyl, much less that he intended to harm or kill E.B. Still, despite the lack of evidence showing such specific knowledge or intent, I leave it to the parties to argue in their sentencing memoranda the extent to which Santiago as an experienced drug dealer likely knew or should have known of the high probability that the cocaine he distributed contained potentially lethal fentanyl.

CONCLUSION

I conclude by a preponderance of the evidence that on May 18, 2021, the defendant Jerrard Santiago knowingly distributed cocaine that was laced with fentanyl to E.B. I further conclude that the fentanyl in this substance proximately caused E.B.'s overdose and death.

It is so ordered.

Dated at New Haven this 18th day of June 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

11